**HELLER FINANCIAL, INC., a Delaware corporation, Plaintiff–Appellee,**

v.

**MIDWHEY POWDER CO., INC., Cassel Garden Farmers' Co–Operative Cheese Company, and Hillside Co–Operative Cheese Manufacturing Association, Defendants–Appellants.**

No. 88–3247.

United States Court of Appeals, Seventh Circuit.

Argued May 26, 1989.

Decided Aug. 17, 1989.

Lloyd Williams, Jr., Patrick F. Klunder, Williams & Montgomery, Chicago, Ill., Nathan Dardick, Ellen Barron Feldman, Carolyn Gallagher Brocksmith, Dardick & Denlow, Chicago, for plaintiff-appellee.

J. Ric Gass, Mark D. Koss, Mark E. Larson, Kasdorf, Lewis & Swietlik, Milwaukee, Wis., for defendants-appellants.

Before WOOD, Jr., MANION, and KANNE, Circuit Judges.

MANION, Circuit Judge.

Defendants-appellants, Midwhey Powder Company, Inc. ("Midwhey Powder"), Cassel Garden Farmers Co-operative Cheese Company ("Cassel"), and Hillside Co-operative Cheese Manufacturing Association ("Hillside") (for ease of reference we refer to all defendants-appellants collectively as "Midwhey"), appeal the district court's (1) denial of their motion to dismiss or transfer venue; (2) decision to strike all of their affirmative defenses; and (3) grant of summary judgment in favor of plaintiff Heller Financial, Inc. ("Heller"). We find Midwhey's arguments on appeal unpersuasive, and affirm.

I.

Midwhey is in the dairy business in northern Wisconsin. Midwhey Powder, Cassel, and Hillside joined together to process their milk into different grades of milk, butter and cheese. The processing produced whey, a waste by-product. Wisconsin environmental regulations required that the whey be broken down before being released into the environment. Typically this was accomplished by boiling the water component out of the whey, leaving a dried powder which could then be resold as animal food. Midwhey wanted to purchase a new co-generation system to more efficiently process the untreated whey. The seller of the new system was Edward & Lee, a Wisconsin engineering firm. Edward & Lee steered Midwhey to Heller to finance the purchase of the whey processing equipment. For its part, Edward & Lee received from Heller what amounts to a commission or finder's fee in the amount of $12,000.

There were two parts to Midwhey's transaction with Heller; a progress payment agreement ("Agreement") and an equipment lease. Until Midwhey accepted the equipment, Heller, according to the

Agreement, was to advance money to Edward & Lee at Midwhey's direction and authorization. These advances or progress payments were to be made according to a schedule which provided that $400,000 be paid to Edward & Lee on March 3, 1986; $300,000 on March 13, 1986; and $200,000 on April 21, 1986. Under the Agreement, if Midwhey did not accept the equipment by July 31, 1986, Heller could demand that it repay an amount equal to the total of all progress payments made, together with any accrued interest. Other than this promise to pay, Heller apparently took no collateral or other security interest to secure the advances.

The second part of the deal was a lease. This became effective only if Midwhey accepted the equipment. Essentially Heller would own the equipment and lease it to Midwhey. There are two key lease provisions so far as this appeal is concerned. The first provided that Midwhey would "submit, at [Heller's] election to the exclusive jurisdiction and venue of any courts [ ] federal, state, or local, having a situs within [Illinois] with respect to any dispute, claim, or suit whether directly or indirectly arising out of or relating to this lease or [Midwhey's] obligations hereunder." The clause also provided that the lease would be governed by the "law of lessor's [Heller's] home office"—Illinois. The second important provision provided that Edward & Lee was not Heller's agent. (The Agreement incorporated the lease's general terms, including the forum-selection clause.)

After reaching agreement with Heller, Midwhey entered into another agreement ("interim interest expense agreement") with Edward & Lee. Heller had no part in this. That agreement required Edward & Lee to make the interest payments owed on the progress payments made by Heller until Midwhey accepted the equipment.

Midwhey, as required by the Agreement, expressly authorized Heller by letters dated February 24, March 10, and April 21, 1986, to make three progress payments. In all, Heller advanced $900,000 to Edward & Lee. Midwhey, though, ultimately did not accept the co-generation equipment; thus the lease never went into effect. Heller demanded repayment of the $900,000 it had advanced plus accrued interest. Midwhey refused, and this litigation ensued.

Heller filed a three-count complaint in the Federal District Court for the Northern District of Illinois. Count I sought relief under the Agreement. Counts II and III were based on the lease. (Heller voluntarily dropped Counts II and III once the district court granted summary judgment on Count I.) Midwhey filed an answer and eleven affirmative defenses.[1] On Heller's motion, the district court struck each affirmative defense, concluding that all but those relating to personal jurisdiction and venue were "frivolous ... on an objective standard." The court gave Midwhey's counsel 14 days to respond; he did not, and the court imposed sanctions on the attorney. Midwhey never sought to amend its original defenses or file any additional affirmative defenses.

Midwhey moved to dismiss the complaint for lack of personal jurisdiction or to transfer venue. The district court denied the motion, finding that Midwhey had consented both to personal jurisdiction and venue by virtue of the valid and binding forum-selection clause contained in the lease. Midwhey's conclusory allegations of misrepresentation and overreaching failed to overcome the forum-selection clause's *"prima facie* validity," the court decided. The court also rejected Midwhey's totally unsupported claim that they would "be deprived of their day in court" if the case proceeded to trial in the Northern District of Illinois.

---

1. The affirmative defenses covered such matters as Midwhey's objections to personal jurisdiction and venue; a challenge to the forum-selection clause; claims that the Agreement and lease were "unconscionable" and contained unenforceable clauses; that the equipment was unmerchantable and never accepted; that Heller had not acted in good faith; that the lease and Agreement provided for usurious interest rates; and, finally, that Edward & Lee, as agent for Heller had "made material misrepresentations as to the equipment," making the lease and Agreement void.

Following the denial of Midwhey's motion to dismiss, the district court set a discovery cutoff date of December 31, 1987, and a trial date of January 19, 1988. After the discovery period closed, Midwhey moved to extend the discovery period, despite the fact that they had never initiated any discovery. The trial court denied the motion, explaining that it had "serious sustained problems with [Midwhey's] diligence." Two days before the scheduled trial, Midwhey filed Chapter 11 bankruptcy petitions. Under 11 U.S.C. § 362, Heller's suit automatically was stayed. The stay was lifted, though, several months later by agreed order to permit the liquidation of Heller's claims.[2] (At oral argument, Midwhey informed the court that it was no longer operating under Chapter 11. This makes moot the claim challenging the award of any interest and attorney's fees incurred since the Chapter 11 filing.)

Heller then filed its summary judgment motion as to Count I. Heller included a statement of facts under then Rule 12(e) (statement of undisputed material facts) of the General Rules of the United States District Court for the Northern District of Illinois ("Local Rules"). Midwhey, in responding to Heller's motion, failed to file the responsive statement required under then Local Rule 12(f), stating genuine issues of material fact. After Heller pointed this out to the trial court, Midwhey, without leave of the court, belatedly filed a Local Rule 12(f) statement. The trial court refused to accept it, explaining that, in any event, its decision on the merits would not be changed by the belated filing. But the court noted that it would have ordered sanctions against Midwhey had it accepted their untimely 12(f) statement because the statement denied the authenticity of the three letters authorizing Heller to make

progress payments, while Midwhey's earlier responses to Heller's requests for admission, Fed.R.Civ.P. 36, admitted the very same letters were "true and accurate." The district court granted summary judgment on Count I, finding Midwhey clearly obligated under the Agreement to repay Heller the $900,000 with interest.

## II.

Before reviewing the merits of the underlying claim comprising Count I, we first will address Midwhey's procedural challenges, namely, the striking of its affirmative defenses and the denial of its motion to dismiss or transfer venue.

Midwhey continues to challenge the trial court's exercise of personal jurisdiction and Heller's choice of venue. Given the lease's forum-selection clause, it faces an uphill struggle. The clause purported to vest "exclusive jurisdiction and venue" in Illinois.[3] But the clause is unenforceable, Midwhey argues, because it is "unreasonable" and "unjust"; was obtained through misrepresentations; and, in any event, cannot by itself establish personal jurisdiction or venue. We disagree.

■ Challenges to personal jurisdiction may be waived by either express or implied consent. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 n. 14, 105 S.Ct. 2174, 2182 n. 14, 85 L.Ed.2d 528 (1985). In the commercial context, parties, for business or convenience reasons, frequently "stipulate in advance to submit their controversies for resolution within a particular jurisdiction." *Id.* See also *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315–16, 84 S.Ct. 411, 414, 11 L.Ed.2d 354 (1964). Such a forum-selection clause should control unless there is a "strong showing that it

---

**2.** The agreed order also permitted Midwhey to bring two additional third-party defendants into the litigation; one of those defendants was Edward & Lee. On September 22, 1988, the district court entered a default judgment in favor of Midwhey against Edward & Lee in the amount of $2,000,000.

**3.** The clause actually says jurisdiction and venue are proper in the state where Heller's "home office" is located. Midwhey makes a feeble

"argument" that this could mean Delaware, since that is where Heller is incorporated. This is belied by Midwhey's answer to Heller's complaint, though, where they admitted that Heller's principal place of business—*i.e.,* home office—is in Chicago, Illinois. Other than that, Midwhey makes no real argument, beyond this observation, as to how or why this should affect the court's jurisdiction or Heller's choice of venue.

should be set aside." *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972). *Cf. Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22, 108 S.Ct. 2239, 2249–50, 101 L.Ed.2d 22 (1988) (concurring opinion) (regarding a motion to transfer under 28 U.S.C. § 1404(a), forum-selection clause is given controlling weight "in all but the most exceptional cases"). Thus, absent a showing that trial in the "contractual forum will be so gravely difficult and inconvenient that [the party challenging the clause] will for all practical purposes be deprived of his day in court ... there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain." *The Bremen,* 407 U.S. at 18, 92 S.Ct. at 1917; *see also Pelleport Investors, Inc. v. Budco Quality Theatres, Inc.,* 741 F.2d 273, 280 (9th Cir.1984). And where "forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972), their enforcement does not offend due process." *Burger King,* 471 U.S. at 472 n. 14, 105 S.Ct. at 2182 n. 14.

■ Midwhey asserts that the forum-clause was not "freely negotiated" because Heller did not disclose the fact that it paid a commission or fee to Edward & Lee for "finding" Midwhey. But Midwhey does not explain how or why the alleged concealment of a fee paid to Edward & Lee amounted to a misrepresentation, let alone a misrepresentation requiring that the forum-selection clause be nullified. The fact that Edward & Lee played some kind of broker role has nothing to do with the forum-selection clause, or for that matter, with the Agreement or lease in any respect. There is no evidence or even hint that Midwhey would have refused the deal had it known of the fee, nor does Midwhey suggest that the Agreement or lease contained unfair terms because of the fee paid to Edward & Lee.

■ Midwhey also contends Edward & Lee made misrepresentations (which may be imputed to Heller) to the effect that no payment needed to be made until the equipment was accepted. This too is unpersuasive. Even if true, this would relate only to the lease; for the Agreement, by its express terms, provided that if Midwhey did not accept the equipment by July 31, 1986, Heller could demand repayment of all progress payments made, with interest. In any event, Midwhey failed to allege any facts from which an agency relationship between Heller and Edward & Lee could be inferred; and it also conveniently ignores the clear terms of the lease which provide that Edward & Lee is not Heller's agent.

Midwhey next contends that the forum-selection clause is "unreasonable under the circumstances," claiming it will be deprived of its day in court if it is enforced. This is so, it tells us, because "all the essential witnesses, i.e., employees of Edward & Lee are beyond the subpoena power of [the district] court and would not appear to testify voluntarily." Yet Midwhey made no attempt to show why these witnesses would be "essential." *Cf. Plum Tree, Inc. v. Stockment,* 488 F.2d 754, 757 n. 2 (3d Cir.1973) (no such showing made regarding a motion to transfer). There also was no showing that the witnesses would not appear voluntarily. Moreover, because summary judgment was granted on the merits, the district court has already decided that, as a matter of law, these witnesses are unnecessary for the resolution of this case.

■ Midwhey then falls back on the claim that they were mere "dairy farmers," not sophisticated businessmen; thus, they should not be held to the standards announced in *Burger King* and *The Bremen* regarding the enforceability of forum-selection clauses. Even if we were to make an exception as to big versus little, or acumen versus naivete in such circumstances, we would need a great deal more than the bare assertion Midwhey makes. Beyond that, we note that two of the defendant "dairy farmers" are incorporated in the State of Wisconsin, thus indicating they are a little more worldly than Midwhey's brief implies.

Lastly,[4] Midwhey tells us that Midwhey Powder's president, August Helmke, never read the forum-selection clause because of his poor eyesight, and that the Heller representatives were in a hurry to catch a plane during the lease negotiations. Apparently they are contending they were unaware of the clause, and that their ignorance was excusable because Helmke could not read it and Heller's rush to catch a plane unduly hurried them. There are several reasons why these factors are unavailing. Helmke testified at his deposition that all four members of defendants' Board of Directors attended the lease negotiations. Also, two others signed the lease (representatives of Cassel and Hillside). Thus, even if Helmke had trouble reading the lease, there were several others with ample opportunity and (apparently, since we are not told otherwise) ability to read the lease.

Besides that, basic contract law establishes a duty to read the contract; it is no defense to say, "I did not read what I was signing." *See, e.g., Karlberg European Tanspa, Inc. v. JK–Josef Kratz Vertriebsgesellschaft,* 618 F.Supp. 344, 347 (N.D.Ill.1985). *See also* J. Calamari & J. Perillo, *Contracts,* § 9–44, p. 418–21 (3d ed. 1987). While some courts in recent years have treated adhesion contracts or form contracts differently regarding the "duty to read," Calamari & Perillo, *Contracts,* § 9–44, p. 418, we see no reason to do so here. There was no evidence that Heller asked Helmke not to read the lease or otherwise prevented him from doing so. *Cf. Marine Bank, National Association v. The Meat Counter, Inc.,* 826 F.2d 1577, 1582 (7th Cir.1987) (summary judgment re-

versed because genuine issues of fact still existed regarding whether signing a document without having read it was justifiable because, among other things, bank had not asked guarantor not to read the loan document). There is also nothing in the record to show the lease-Agreement deal was presented as a take-it-or-leave-it proposition. *See Pelleport Investors, Inc.,* 741 F.2d at 281. Moreover, the reluctance to enforce the duty to read usually is reserved for situations where to enforce the duty would be "unfair under the circumstances," Calamari & Perillo, *Contracts,* § 9–44, at 421, or would cause "great hardship," *id.* at 419. Neither evil is present here. Midwhey had several representatives who could have read the document; and Helmke understood that this was a substantial financial transaction, yet he never even considered consulting an attorney before signing the documents.

That Heller's representatives were in a hurry is of no moment. Helmke, though he now implies he was unfairly rushed into signing the lease, never asked for more time to review the lease, nor did he ask the Heller people to wait until he had reviewed it. And there is nothing in the record showing that the lease had to be signed on that particular day. Midwhey does argue it was under time pressure to get the new co-generation system up and operating quickly; but there is nothing to suggest this amounted to more than is bearable under ordinary business conditions.[5]

In short, the record offers no support for Midwhey's conclusory allegations contesting the forum-selection clause as it relates to personal jurisdiction.

---

**4.** Midwhey misreads *Burger King, supra,* to make one additional argument. In *Burger King,* the Supreme Court stated, with regard to a *choice-of-law* provision, that such a clause by itself would be insufficient to confer personal jurisdiction. *Id.* at 482, 105 S.Ct. at 2187. Midwhey, citing this part of the Court's opinion, argues the forum-selection clause in this case by itself cannot support a finding of personal jurisdiction. But here we are dealing with a forum-selection clause—though it is contained in a clause titled "choice of law: service of process" —not merely a clause purporting to dictate the law under which disputes will be resolved. Ob-

viously, a valid forum-selection clause, even standing alone, can confer personal jurisdiction. *Burger King,* 471 U.S. at 472 n. 14, 105 S.Ct. at 2182 n. 14.

**5.** In fact, one could argue that this pressure to get the system into operation may have been a detriment *to Heller as well. Heller obtained no* security for its $900,000 advance. Its recovery depends on its ability to collect from Midwhey who has been in and out of bankruptcy. *Cf. Ash v. Wallenmeyer,* 879 F.2d 272, 273–74 (7th Cir.1989).

■ Failing on their personal jurisdiction challenges, Midwhey next argues that the district court abused its discretion in refusing to transfer the case to one of the federal district courts in Wisconsin under 28 U.S.C. § 1404(a). Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Despite the existence of a valid forum-selection clause, courts may still transfer a case under § 1404(a). *See Stewart Organization, Inc. v. Ricoh Corp.*, 108 S.Ct. at 2245 (forum-selection clause is not dispositive under § 1404(a)); *Plum Tree, Inc. v. Stockment*, 488 F.2d at 757–58; *Rouse Woodstock, Inc. v. Surety Federal Savings & Loan*, 630 F.Supp. 1004, 1008 (N.D.Ill.1986). This is because only one of § 1404(a)'s factors— convenience of the parties—is within the parties' power to waive. *Plum Tree, Inc. v. Stockment*, 488 F.2d at 757–58. In other words, a valid forum-selection clause may waive a party's right to assert his own inconvenience as a reason to transfer a case, but district courts still must consider whether the "interest[s] of justice" or the "convenience of ... witnesses" require transferring a case. *Id.* *See also Rouse Woodstock, Inc.*, 630 F.Supp. at 1008.

Our review of the district court's denial of a motion to transfer is limited. District courts have broad discretion to grant or deny a motion to transfer under § 1404(a), and will not be reversed absent a clear abuse of discretion. *Cote v. Wadel*, 796 F.2d 981, 985 (7th Cir.1986); *Federal Deposit Insurance Corp. v. Citizens Bank and Trust Co.*, 592 F.2d 364, 368 (7th Cir.), *cert. denied*, 444 U.S. 829, 100 S.Ct. 56, 62 L.Ed.2d 37 (1979).

■ Midwhey has the burden of showing that "the transferee forum is clearly more convenient." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219–20 (7th Cir. 1986). Midwhey proffers two reasons which it contends compel the transfer of this case. It first contends that any witnesses in Illinois—Heller's present and former employees—are "not necessary" because Midwhey does "not dispute the existence of the [Agreement and the lease]." On the other hand, "essential" witnesses for Midwhey's case—Edward & Lee employees—are not amenable to process in the Northern District of Illinois. The second transfer rationale advanced is that defendants live and work in northern Wisconsin; and forcing them to litigate in Chicago will "work a great hardship" on them. Neither reason is persuasive.

■ By virtue of the forum-selection clause, Midwhey has waived the right to assert its own inconvenience as a reason to transfer the case, *i.e.*, the "great hardship" of litigating in Chicago. At any rate, the mere inconvenience of having to travel to Chicago to litigate did not require the district court to transfer the case, and its refusal does not amount to depriving Midwhey of a meaningful day in court. *Pelleport Investors, Inc.*, 741 F.2d at 281. Further, although transferring the case to a Wisconsin federal court may be more convenient for Midwhey's witnesses, that convenience is gained only at the expense of Heller's witnesses. Neither the convenience of the parties nor the witnesses required the district court to transfer the case. But this still leaves the "interest[s] of justice" prong of § 1404(a) to consider.

■ The "interest[s] of justice" include such concerns as ensuring speedy trials, trying related litigation together, and having a judge who is familiar with the applicable law try the case (here the law of Illinois applies, according to the lease). *Coffey v. Van Dorn Iron Works*, 796 F.2d at 221. Essentially Midwhey argues a fair trial is impossible in Illinois because the key witnesses are beyond the trial court's reach. But it never goes beyond vague generalizations in making this claim. To support its contention, Midwhey was obligated to clearly specify the key witnesses to be called and make at least a generalized statement of what their testimony would have included. *See, e.g., Vassallo v. Niedermeyer*, 495 F.Supp. 757, 760 (S.D.N.Y. 1980); *Crossroads State Bank v. Savage*, 436 F.Supp. 743, 745 (W.D.Okla.1977). Midwhey supplied nothing in the way of

affidavits, depositions, stipulations, or any other type of document containing facts tending to establish who (specifically) it planned to call or the materiality of that testimony. *Plum Tree, Inc. v. Stockment,* 488 F.2d at 756–57, 757 n. 2. Moreover, as a practical matter, transferring the case to a federal district court in Wisconsin on the basis that Midwhey asserts—availability of additional witnesses—would be futile. The district court has already determined that, as a matter of law, no genuine issues of fact exist and Heller is entitled to judgment on Count I (the Agreement) as a matter of law. No additional witnesses, no matter where they are, are necessary, making Midwhey's arguments for transfer purely academic. *Cf. Coffey v. Van Dorn Iron Works,* 796 F.2d at 222 (even if court had granted motion to transfer, transfer would have been futile because the ultimate result, dismissal, would not be changed).

A valid forum-selection clause placed venue in Illinois; some weight must be given to Heller's choice of forum, *FDIC v. Citizens Bank & Trust,* 592 F.2d at 368; *Heller Financial, Inc. v. Nutra Food, Inc.,* 655 F.Supp. 1432, 1434 (N.D.Ill.1987); the Illinois court would be familiar with applicable law, *Coffey v. Van Dorn Iron Works,* 796 F.2d at 221; *Heller Financial, Inc. v. Shop-a-lot, Inc.,* 680 F.Supp. 292, 296 (N.D.Ill.1988); and, despite Midwhey's conclusory and unfounded assertions to the contrary, transferring the case to a district court in Wisconsin only shifts the inconvenience to Heller. *FDIC v. Citizens Bank & Trust,* 592 F.2d at 368; *Heller Financial v. Shop-a-lot,* 680 F.Supp. at 295–96. For all of these reasons, we conclude the district court acted entirely within its broad discretion in declining to transfer the case.

## III.

 Next Midwhey complains that the trial court erred in striking all of their affirmative defenses. Before addressing Midwhey's arguments, we note the absence of any resultant prejudice which could have occurred by the district court's striking of Midwhey's defenses. Defenses are plead-

ings, and as such, leave to amend is freely granted as justice requires. Fed.R.Civ.P. 15(a). Midwhey made no attempt to amend its defenses despite the fact that they were dismissed on technical grounds, e.g., failure to adequately plead. Thus, its claims of prejudice ring hollow; it easily could have alleged more facts or taken discovery if the facts were not immediately known. Regardless, its claims are meritless.

 Midwhey places great reliance on the general rule that motions to strike are disfavored. This is because motions to strike potentially serve only to delay. *See United States v. 416.81 Acres of Land,* 514 F.2d 627, 631 (7th Cir.1975) (Clark, J.). But where, as here, motions to strike remove unnecessary clutter from the case, they serve to expedite, not delay. Affirmative defenses will be stricken only when they are insufficient on the face of the pleadings. *Id.* at 631. Ordinarily, defenses will not be struck if they are sufficient as a matter of law or if they present questions of law or fact. *Id.* Affirmative defenses are pleadings and, therefore, are subject to all pleading requirements of the Federal Rules of Civil Procedure. *Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734, 736–37 (N.D.Ill.1982). Thus, defenses must set forth a "short and plain statement," Fed.R. Civ.P. 8(a), of the defense. *Bobbitt,* 532 F.Supp. at 737.

Of Midwhey's eleven affirmative defenses, four went to personal jurisdiction and venue (defenses 1–4). The others included claims that: the co-generation equipment was unmerchantable and never accepted by Midwhey; Heller did not deal in good faith; the contracts, i.e., the lease and Agreement, were unconscionable; the contracts contained unenforceable penalty, damages, and attorney's fees clauses; the contracts' interest rates were usurious; and, finally, Edward & Lee, as Heller's agent, made certain misrepresentations, thus voiding the contracts. The defenses based on personal jurisdiction and venue without doubt are legally insufficient. They are just restatements [6] of Midwhey's motion to dis-

---

6. Midwhey's first affirmative defense contested

personal jurisdiction for lack of "substantial

miss or transfer venue, which, as we discussed above, was properly denied.

The remaining defenses are equally meritless. They are nothing but bare bones conclusory allegations. Midwhey omitted any short and plain statement of facts and failed totally to allege the necessary elements of the alleged claims. Indeed, the district court found all Midwhey's affirmative defenses, except those based on personal jurisdiction and venue, frivolous, and ordered sanctions under Fed.R.Civ.P. 11. Midwhey's attorney nevertheless has pursued these meritless defenses on appeal. The appellate arguments are merely perfunctory restatements of Midwhey's arguments to the district court. Nowhere does Midwhey point out just where it thinks the district court went wrong. In similar situations sanctions under Fed.R.App.P. 38 have been warranted. *See Mays v. Chicago Sun–Times*, 865 F.2d 134, 138 (7th Cir. 1989).

■■■ By continuing to press properly rejected and sanctioned arguments [7] without so much as even acknowledging that sanctions were ordered by the trial court, or even attempting to point out how the trial court erred—either by awarding sanctions (Midwhey's attorney, when given the chance to respond to the district court's sanctions order, did nothing) or on the merits generally, Midwhey could not have held out much hope for success. But even so, we do not conclude that this is an appropriate case for sanctions. For the most part Midwhey's arguments (*e.g.*, regarding personal jurisdiction and venue), though un-

successful, were at least plausible. *Cf. Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir.1987). And the arguments concerning the affirmative defenses generally were substantially intertwined and not easily severable, thus requiring Heller to respond in any event.

## IV.

■■■ Finally, Midwhey complains that summary judgment was improperly granted, as genuine issues of material fact remained unsettled. We review the district court's entry of summary judgment *de novo*. *Schroeder v. Copley*, 879 F.2d 266, 268 (7th Cir.1989). We will not reverse a grant of summary judgment unless the dispute about a material fact is genuine, " 'that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party.' " *Farries v. Stanadyne*, 832 F.2d 374, 378 (7th Cir.1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); Fed.R.Civ.P. 56(c). A factual dispute does not preclude summary judgment unless the disputed fact is " 'outcome determinative under the governing law.' " *Shlay v. Montgomery*, 802 F.2d 918, 920 (7th Cir.1986) (quoting *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983)).

The dispute in this case boils down to the fact that Midwhey does not like the deal, and thinks it unfair. It characterizes the Agreement-lease arrangement essentially as the Agreement "says you pay if you fail

contacts" and "want of proper service." The former contention plainly is without merit given our conclusion that the forum-selection clause is valid and enforceable. As for the latter contention, Midwhey's appellate brief devotes a mere two sentences without citation to the record or any authority whatever. This does not constitute an argument, Fed.R.App.P. 28(a)(4), and will not be considered. *Gold v. Wolpert*, 876 F.2d 1327, 1331 n. 6 (7th Cir.1989).

7. Midwhey compounds the problem here by its treatment of affirmative defense No. 10 (alleged usurious interest rates). As even Midwhey recognizes, this defense is unavailable to corporations in both Illinois and Wisconsin (one or the other's law applies). *See* Ill.Rev.Stat. ch. 17

¶ 6404(1)(a); Wis.Stat.Ann. § 138.05. But it claims, for the first time in its reply brief, that defendants are cooperatives, and that the availability of the usury defense is not settled with respect to co-ops. Because this argument was raised for the first time in the reply brief, it will not be considered. *Gold v. Wolpert*, 876 F.2d at 1331 n. 6. But there is a more serious problem. Defendants say they are co-ops, not corporations, and hinge the defense's availability on this distinction. However, they admitted in their answer to the complaint that two of the three defendants, Midwhey Powder and Cassel, were Wisconsin *corporations*! Thus, even defendants must acknowledge their defense is unavailable as to Midwhey Powder and Cassel.

to accept the equipment, and [the] lease says you pay only if you accept a complete operating system." This, Midwhey complains, amounts to a "heads I win, tails you lose" situation. The short answer is that that was what was bargained for; and it is not so overreaching or unfair on its face to somehow disregard or nullify it—even if that were possible. Indeed, the deal was neither harsh nor commercially unreasonable. Midwhey alone stood to gain from any benefits resulting from the equipment, so it stood to reason that it alone—not Heller—bore the risks too.

The transaction between Heller and Midwhey was comprised of two discrete but related parts. The Agreement ensured that the *co-generation* equipment vendor (Edward & Lee) would be paid as the equipment gradually was installed. The progress payments were spaced out over a period of weeks. Heller would make the payments only upon Midwhey's express authorization. Midwhey in fact authorized, in writing, progress payments totaling $900,000. Also, under the Agreement, Midwhey was obligated to pay Heller interest on the amounts advanced. (Curiously, Heller did not appear to secure this interim loan with anything other than Midwhey's promise to repay.) A related agreement between Midwhey and Edward & Lee, the interim interest expense agreement, provided that Edward & Lee would pay to Heller the interim interest until Midwhey accepted the equipment.

If Midwhey did not accept the equipment, then upon Heller's demand it was obligated to repay Heller an amount equal to all progress payments actually made, together with interest. If, however, Midwhey did accept the equipment, the second part of the transaction kicked in—a lease agreement between Heller and Midwhey, under which Heller actually would own the equipment and lease it to Midwhey. To make a long story short, Midwhey never accepted the equipment, and Heller demanded repayment of the $900,000 advanced to Edward & Lee plus interest.

Midwhey has failed to identify any genuine issue of material fact requiring a trial.

Midwhey contends that "the agents of Edward & Lee made representations that the [co-generation] system would work" and that "the Heller agent represented to the defendants that there would be no payments until the Lease was accepted and the equipment was accepted in working condition...." It adds that the interim interest expense agreement between itself and Edward & Lee supports its position that no payments would be due Heller until the equipment was accepted. Finally, Midwhey asserts that the lease-Agreement transaction was an integrated deal, and that its parts—*i.e.*, the Agreement—cannot be viewed in isolation.

■ None of these "facts," however, are outcome determinative. By virtue of its failure to file a then Local Rule 12(f) statement of genuine issues of material fact with its response to Heller's summary judgment motion, *see Abrams v. City of Chicago*, 635 F.Supp. 169, 171–72 (N.D.Ill. 1986), Midwhey admitted all the relevant facts upon which Heller relies (*e.g.*, Heller and Midwhey entered into the Agreement; Heller advanced funds on behalf of Midwhey at Midwhey's direction; and Midwhey made no monthly interest payments). But we do not have to rely only on this.

Any representations that Edward & Lee may have made to Midwhey are irrelevant here. The Agreement concerned only Heller and Midwhey; Edward & Lee's alleged representations only would be relevant in Midwhey's case against Edward & Lee (in which Midwhey has obtained a default judgment in the amount of $2,000,000). Moreover, the lease explicitly provided that Edward & Lee was not Heller's agent; and Midwhey failed to offer a single fact, other than that Edward & Lee "found" Midwhey, to establish an agency relationship between Heller and Edward & Lee.

We agree with the district court that it is of no moment that the Agreement and the lease were integral parts of a larger transaction. The Agreement and lease were drafted to complement one another, and the facts of this case fit neatly into their scheme. Thus, although Midwhey did not accept the equipment and the lease never

took effect, the Agreement, by its clear, unambiguous terms did apply. And it is entirely consistent with the Agreement-lease arrangement that no payments would be required under the lease until the equipment was accepted.

We also agree with the district court that the interim interest expense agreement, requiring Edward & Lee to pay interest until the time Midwhey accepted the equipment, was "inexplicable unless, as all other evidence shows, the defendants clearly understood they had an obligation to pay interest before the equipment was accepted." We have considered and rejected Midwhey's remaining arguments challenging the grant of summary judgment. There is no genuine issue as to any material fact and Heller is entitled to a judgment as a matter of law.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.